Tara Natarajan
State Bar No. 263333
10382 Westacres Drive
Cupertino, CA 95014
(408) 250-7269

UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Dr. Sundar Natarajan,<br><br>                    Plaintiff,<br><br>        vs.<br><br>Dignity Health,<br><br>                    Defendant(s) | )  Case No.: No. _____<br>)<br>)  COMPLAINT FOR DECLARATORY AND<br>)  INJUNCTIVE RELIEF<br>)<br>)<br>)<br>)<br>)<br>) |

## I. THE RELIEF SOUGHT BY DR. NATARAJAN

1. In California, physicians have a fundamental vested property right to practice their profession. This right is amplified for physicians who practice medicine exclusively as hospitalists, like Dr. Natarajan. However, California law now permits private corporations to take away or limit physicians' right to practice medicine without due process of law. This lawsuit is intended to redress the ongoing unconstitutional deprivation of the rights of Dr. Sundar Natarajan and other California physicians, specifically hospitalists.

2, The State of California has the legal responsibility to protect the public health by monitoring and disciplining California physicians and, to prevent California residents from receiving unsafe or incompetent medical care. Pursuant to statute and case law, California has expressly delegated to private health corporations the primary responsibility for monitoring, investigating, disciplining and

reporting California physicians. Those private health corporations are now permitted under state law to restrict or remove a physician's ability to practice medicine without due process of law.

3. Plaintiff Dr. Natarajan is a highly qualified and competent physician who made complaints to hospital administrators to protect the safety of patients at their hospitals. He also was a direct economic competitor of the hospital. The Defendant, a private health corporation who operated the hospital where he worked, subsequently retaliated against him and removed his privileges under color of state law through actions which violated federal due process protections.

4. This lawsuit seeks a declaration that California's law governing medical disciplinary actions by private corporations violates the Fourteenth Amendment's guarantee of due process of law and 42 U.S.C. section 1983. Dr. Natarajan also seeks an injunction requiring the reinstatement of his hospital privileges at St. Josephs which was terminated by Defendant Dignity on November 2015.

## II. IDENTIFICATION OF THE PARTIES

5. Dr. Sundar Natarajan is a physician trained in internal medicine and pediatrics licensed to practice medicine in California. Defendant Dignity Health is a private California corporation in the business of providing healthcare. Dignity owns and operates St. Joseph's Medical Center, the hospital in which Dr. Natarajan's privileges were terminated.

## III. JURISDICTION OF THIS COURT

6. This court has jurisdiction over this case pursuant to 28 U.S.C. section 1331, because it is a civil action arising under the Constitution and law of the United States. This court also has jurisdiction over this case pursuant to 28 U.S.C. section 1343 because it is brought to redress the deprivation, under color of State law, statute, ordinance, regulation, custom or usage, of a right, privilege or immunity secured by the Fourteenth Amendment of the Constitution of the United States and by 42 U.S.C. section 1983.

## IV. VENUE

Complaint for Declaratory and Injunctive Relief - 2

7. Venue is proper in the EasternNorthern District of California, pursuant to 28 U.S.C. section 1391, subd. (b), because Defendant Dignity is headquartered in San Francisco, California. Venue is also proper in the Northern District of California as to the Defendant in this action pursuant to 28 U.S.C. section 1391, sub. (c), because the defendant has sufficient contacts with the Northern District of California to subject it to personal jurisdiction if that district were a separate State.

## V. INTRADISTRICT VENUE

8. Intradistrict venue is proper in the San Francisco Division because Defendant is headquartered in San Francisco.

## VI. CALIFORNIA'S PEER REVIEW PROCEDURES VIOLATE DUE PROCESS.

**California's "Fair Hearing" Requirement Was Created to Protect Physicians' Right to Practice Their Profession.**

9. Starting in 1959, with the case of *Wyatt v. Tahoe Forest Hospital* (1959) 174 Cal.App.2d 709, 715, the California courts developed a common law doctrine that physicians could not have their hospital privileges restricted or revoked without first receiving a "fair hearing.". The California courts initially adopted the fair hearing requirement to protect the rights of physicians in public hospitals. The requirement was then extended to private hospitals, private medical groups, and private medical societies. The California Supreme Court held in *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 823-825, that physicians have a fundamental and vested protected property right to practice their profession and cannot fully exercise that right without access to hospitals.

10. The California Legislature codified the requirements of fair hearing procedures in 1989, following the passage of a federal law, the Health Care Quality Improvement Act of 1986, which regulated peer review proceedings. The stated purposes of the1989 law, California Business and Professions Code section 805 et seq., were to protect both patient safety and the right of physicians to practice their profession.

**Medical Disciplinary Hearings Are State Action.**

11. It is a duty and function of the State of California to protect the health and welfare of the people of California. In the 1989 act, the legislature delegated to private health care entities primary responsibility for monitoring and disciplining physicians in the interest of public safety.

12. Under California Business and Professions Code section 809, subd. (a)(3) it is the express policy of the State of California that "peer review, fairly conducted, is essential to preserving the highest standards of medical practice." Under California Business and Professions Code section 809, subd. (a)(4) it is the express policy of the State of California that "peer review that is not conducted fairly results in harm to both patients and healing arts practitioners by limiting access to care."

13. Under California Business and Professions Code section 809, subd. a(6), it is the express policy of the State of California to use peer review conducted by private entities to exclude physicians who provide substandard care or who engage in professional misconduct, in order to protect the health and welfare of the people of California. Pursuant to Section 809, subd. (a)(9)(A), an express propose of the 1989 Act was to integrate public and private peer review in California. Pursuant to Section 809, subd. A(8), the State required hospital medical staffs and their governing bodies to adopt bylaws implementing the provisions of the 1989 Act.

14. Under California Business and Professions Code section 805 et seq., private hospital entities are required by statute to give physicians a hearing before taking any action restricting or revoking privileges or employment for a "medical disciplinary cause or reason." A medical disciplinary cause or reason is defined in Business and Professions Code section 805, subd. a(6) as "that aspect of a licentiate's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." Business and Professions Code section 809.5 permits a healthcare corporation to summarily suspend a physician without a hearing, but only if patients or someone else might be in "imminent danger" if the physician is allowed to continue to practice. In addition, Section 809.5 requires a physician to receive the opportunity for a "fair hearing" after the summary suspension. Business and Professions Code Section 805, subds (c) and (e) require that

disciplinary actions taken by private corporations be reported to the State in "805 Reports." A failure to make a required 805 report is punishable by fines up to $100,000. These 805 reports are then used by both State and other private healthcare corporations to determine whether the physician's practice of medicine should be further restricted or terminated. Hospitals and other healthcare corporations are required to request and review any 805 reports on file with the Medical Board of California before granting or renewing a physician's medical staff privileges pursuant to Business and Professions Code section 805.5. A failure to comply with section 805.5 is a criminal offense. The State's system of monitoring and disciplining physicians to ensure the public health and safety is intertwined with the performance by private healthcare corporations of medical disciplinary hearings and medical disciplinary actions.

15. This delegation of the State's responsibility for maintaining the public health and safety was expressly confirmed by the California Court of Appeal in the case of *Unnamed Physician v. Board of Trustees* (2001) 93 Cal. App. 4th 607, 617. The California Supreme Court subsequently held in *Kibler v. Northern Inyo County Local Hospital District* (2006) 39 Cal.4th 192, 196, that "the Business and Professions Code sets out a comprehensive scheme that incorporates the peer review process into the overall process for the licensure of California physicians." It further held that a medical disciplinary hearing is an "official proceeding authorized by law . . . ." (*Id.*, at p. 199.) It held that the Legislature has accorded to these hearings "a status comparable to that of quasi-judicial public agencies whose decisions likewise are reviewable by administrative mandate." (*Id.*, at p. 200.) It also held that the Legislature has delegated to private hospitals "the primary responsibility for monitoring the professional conduct of physicians licensed in California." (*Id.*, at p. 201.) Thus, the California Supreme Court has held that the State has delegated a greater responsibility for monitoring physicians to private hospitals than to the Medical Board of California. Because of the State's delegation to private healthcare corporations of the official responsibility for safeguarding the public health and safety

through monitoring and disciplining physicians, the actions of those private entities constitute state action.

**California Healthcare Corporations Now Use Medical Disciplinary Hearings To Deny Due Process of Law to Physicians.**

16. Since the passage of the 1989 Act, private health care corporations, including Defendant Dignity has used the law to deny physicians due process of law. There are three different ways in which the California disciplinary system violates due process.

**California Healthcare Corporations Are Permitted to Unilaterally Choose the Judge and Jury in an Adversarial Proceeding Which Will Determine a Physician's Right to Practice His Profession.**

17. The first due process violation occurs because California law permits private health corporations who are adversaries of a physician to choose the hearing officer and hearing panel that will render a decision as to whether the private health corporations' actions against the physician are reasonable and warranted. Disciplinary proceedings against a physician are inherently adversarial. Healthcare corporations seeking to impose discipline on a physician may do so for a variety of reasons besides a genuine concern about the quality of a physician's care or his or her behavior. A healthcare corporation may want to eliminate or punish whistleblowers, to prevent further whistleblowing by that physician and to deter whistleblowing by other physicians. Personal antagonisms or fear of bad publicity also lead to disciplinary actions by a healthcare corporation. A healthcare corporation may want to eliminate its direct economic competitor.

18. Whatever the motive of a healthcare corporation for wanting to discipline a physician, the stakes are usually high for both the corporation and the physician. For a physician, an adverse disciplinary decision always results in an "805" report to the California Medical Board and a report to the National Practitioner Data Bank, each of which significantly damages the physician's reputation and may, as a practical matter, limit or eliminate the physician's ability to practice medicine. A

disciplinary action usually results in a loss of income and significant emotional distress. Challenging a proposed or final disciplinary action usually takes large financial expenditures for attorneys and expert witnesses, often exceeding $100,000 or much more. For the healthcare corporations, the stakes are likewise high. They have a strong economic stake in the outcome. If they attempt to discipline a physician and fail, they may be liable to the physician for bad faith peer review, interference with the physicians' ability to practice his profession, anti-trust violations and/or other legal claims. Physicians' monetary claims and potential recoveries are often worth millions, because of the damage to their careers and the value of those careers. In addition, the healthcare corporations may suffer significant bad publicity if they are found to have punished a physician unfairly or in retaliation for whistleblowing activity, which would affect both their marketing and their revenue. The healthcare corporations therefore have a great financial incentive to ensure that they win when they attempt to discipline a physician.

19. The California law governing the selection of the hearing officer and hearing panel members, Business and Professions Code section 809.2, subd. a, gives the healthcare corporations the authority to decide whether physicians charged with conduct detrimental to patient care or safety will have their hearings decided by (1) neutral arbitrators chosen by a process mutually agreeable to the physician and the healthcare corporations, or (2) by a panel of physicians with a hearing officer who serves as the presiding judge. The statute is silent on the question of who should pick the hearing officer and panel members if neutral arbitrators are not used. Healthcare corporations have taken advantage of this silence to assert their authority to unilaterally appoint a hearing officer and hearing panel members. When they choose to do so, they can select a hearing officer and panel members that they believe that they can count on to affirm the wishes of the health care corporation. Although the statute also permits a decision by neutral arbitrators, health care systems, including defendants, never or virtually never use neutral arbitrators. This is the only system of law in American jurisprudence in

which a private entity in an adversarial confrontation with another private party is permitted to choose the judge and jury who will decide the conflict. This is a fundamental violation of due process.

**California Healthcare Corporations Are Not Required to Use a Known Objective Standard to Determine Quality Issues in Medical Disciplinary Hearings.**

20. The second violation of due process occurs because California law permits healthcare corporations to discipline a physician for alleged quality problems without the requirement of any known objective standard.

21. Due process requires that a person be judged by a known standard so that actions against individuals are not arbitrary or capricious. Without a known standard under which a person is judged, one person may be severely punished for a minor mistake or error, while others may be permitted to avoid any punishment for much more serious problems. In addition, the lack of a standard makes effective judicial review nearly impossible on substantive clinical issues, because the reviewing court has no ability to measure the physician's conduct against any objective standard.

22. To support a proposed medical disciplinary action, a healthcare corporation may charge a physician with either clinical medical care problems, behavioral problems, or both. In regard to alleged behavioral problems, in *Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 628- 629, the California Supreme Court adopted an objective standard for behavioral issues: any alleged behavioral problems must have been sufficient "to present a real and substantial danger that patients treated by him might receive other than a 'high quality of medical care' at the facility." In regard to clinical medical issues, neither the California legislature nor the California courts have ever adopted a standard for clinical issues.

23. In other California medical-legal proceedings, the "standard of care" is used as the applicable standard. Under California law, the standard of care is defined as the reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. This standard is used by the Medical Board of California in its

disciplinary actions and it is also the standard used in medical malpractice cases. However, in healthcare corporations' disciplinary proceedings, there is no legal requirement that the standard of care be used as the applicable standard in a hearing. As a consequence, a healthcare corporation's hearing panel may determine that discipline is warranted even though it does not find that the physician violated the standard of care.

**There Is No Effective, Timely and Independent Judicial Review of Medical Disciplinary Hearings in California.**

24. The third reason that California's disciplinary system violates due process is the fact there is not effective, timely and independent judicial review of healthcare corporations' disciplinary hearings before, during or after disciplinary actions are taken.

25. Physicians are not permitted to challenge in state court the hearing officer and hearing panel appointed by a healthcare corporation in state court, no matter how biased or unfair their selection, until after the hearing is concluded. Business and Professions Code section 809.2 permits a physician to voir dire the appointed hearing officer and panel members. However, that section also states that it is the hearing officer who shall rule on whether the hearing officer or any hearing panel member is biased. The hearing officers are generally very well paid for their services as hearing officer by the healthcare corporations. They are often attorneys that represent healthcare corporations as the mainstay of their legal practices. Hospital attorneys often arrange for the appointment of other hospital attorneys they know well as the hearing officers for the disciplinary hearings.

26. The hospital attorneys appointed as hearing officers have several powerful financial reasons to reject a challenge to their service. First, a hearing officer that accepts the challenge to his or her service will lose the income from being the hearing officer in that case. A hearing officer's income from a single hearing can exceed $100,000 in a lengthy and complex case. Second, if the hearing officer accepts the challenge, he or she is unlikely to be appointed again by the healthcare corporation and hospital attorney who were involved in the appointment. Third, a hospital attorney appointed as a

hearing officer who hears a challenge to his or her service is likely to fear damaging the attorney's ongoing relationships with his corporate healthcare clients if he or she fails to go along with the system in which hospital attorneys appoint each other to serve as hearing officers.

27. In the case of *Kaiser v. Superior Court* (2005) 128 Cal.App.4th 85, 109, the Court of Appeal ruled that a physician is not permitted to challenge the appointment of a hearing officer or any of the hearing panel members until the hearing has been completely finished. A healthcare corporation can appoint a biased hearing officer, even one of its own attorneys, as the hearing officer, without fear that a court can will intervene to disqualify the hearing officer before the hearing decision. A healthcare corporation likewise can appoint one of its top managers to a hearing panel, without fear of court intervention during the hearing process. A physician cannot escape the expense, stress and time expenditure involved in litigating a fundamentally flawed hearing, no matter how obvious it is that the hearing officer and/or a hearing panel member is unqualified to serve as a result of his bias or conflict of interest.

28. Under California law, there is also no independent review of the evidence used to support a healthcare corporation's disciplinary action against a physician. In 1977, the California Supreme Court held in *Anton v. San Antonio Community Hospital*, *supra,* 19 Cal.3d 802, 822- 825, that the evidence supporting a medical disciplinary action was subject to independent review by the fundamental vested right to practice his profession. An independent review of the evidence presented at administrative hearings was and is the standard used for judicial review of other administrative hearings in which a fundamental vested right is at stake in the hearing.

29. In 1978, however, the California Legislature intervened and passed an amendment to Section 1094.5 so that in physician disciplinary hearings, the decision of the healthcare corporation only needs to be supported by any substantial evidence. The ability of courts to independently weigh the evidence supporting a medical disciplinary action was eliminated. As a result, there is no effective judicial review of medical disciplinary hearings on the issue of whether the evidence presented

supports a healthcare corporation's decision on clinical competence issues. In order to prevail on the substantial evidence issue, a healthcare corporation need find only a single expert who is willing to opine (often after having been paid tens of thousands of dollars) that the physician facing charges did something wrong. Thus, an exceedingly weak case against a physician may be decided against him by a jury handpicked by the hospital, but neither a California superior court nor a California court of appeal has the legal authority to reverse the decision on substantive grounds, if any substantial evidence supports the decision.

30. On the other hand, if a physician wins his disciplinary hearing, the healthcare corporation is not required to accept the decision under California law. Even if the hearing panel's decision against discipline is supported by substantial evidence, the governing body may choose to disregard the decision and discipline the physician anyway.

31. There is also no effective judicial review of healthcare corporations' disciplinary decisions because under California law, judicial review often takes six years or more, depriving a physician of his right to practice medicine in a hospital during a substantial part of his or her career without due process.

32. The initial disciplinary hearing typically takes at least six months to complete and may take as long as two years or more. If the governing body makes a decision against a physician, then the physician must ordinarily obtain a writ of mandate overturning the decision before filing an action for damages or reinstatement. California superior court proceedings on a writ of mandate often take a year or longer to conclude.

33. If the physician wins a writ in the superior court, then the healthcare corporation can appeal the decision. The decision of the superior court has virtually no significance, because the Court of Appeal undertakes the same review of the record as the superior court and gives no deference to the superior court's decision. The appeal ordinarily takes another 19 to 26 months. If the physician wins the appeal, then the physician should be able to file a civil action for reinstatement and damages.

34. However, when the California Supreme Court determined in the *Kibler* case that healthcare corporations' disciplinary proceedings are official proceedings, it held that participants in those proceedings may therefore enjoy the protection of the state's Anti-SLAPP (Anti-Strategic Lawsuit Against Public Participation) law. California Code of Civil Procedure, section 425.16. As a result, when a physician files a civil suit seeking reinstatement and damages, the healthcare corporation may bring an anti-SLAPP motion, which stays discovery until the motion is resolved. If the physician defeats the anti-SLAPP motion in superior court, Section 425.16 gives the losing defendant an automatic right to appeal, no matter how lacking in merit its anti-SLAPP motion. The defendant can therefore postpone consideration of the merits of a physician's reinstatement claim for another 19 to 26 months while the anti-SLAPP appeal is pending. If the defendants lose their appeal of the anti-SLAPP motion, then the physician may finally pursue his action for reinstatement and damages in superior court. Such actions ordinarily take a year or more for discovery and trial. If the physician wins an order for reinstatement, the defendant can appeal, again postponing final resolution of the case for 19 to 26 months.

35. Thus, under California law, a healthcare corporation can usually prevent a physician from obtaining a final judicial decision on a summary suspension or a denial of hospital privileges for six years or more. During that time, a physician's fundamental right to practice medicine is limited or foreclosed entirely in violation of due process.

36. The denial of due process to California physicians subjected to medical disciplinary hearings proximately causes severe and irreparable injuries to those physicians. Physicians in California subject to medical disciplinary hearings without due process suffer irreparable harm due to the infringement on their fundamental vested property right to practice their profession, their inability to treat and care for their patients, and the irreparable damage to their reputations arising from legally required reports of the State and Federal government, and self-reporting requirements of private healthcare corporations when a physician applies for employment or privileges to practice.

**Defendant Dignity Acted Under Color of State Law to Deprive Plaintiff of Due Process of the Law in the Medical Disciplinary Proceedings that Defendant Designed and Controlled.**

37. California Business and Professions Code section 809.2 establishes in very general terms the procedures under which hospitals must conduct the "fair hearings" delegated to them by the state of California. Defendant Dignity Health has taken advantage of the lack of specificity in the law to design and implement "fair hearing" procedures enshrined in bylaws that violate the due process rights of physicians in the manner described in this complaint. The individuals who conducted the "fair hearings" did so in accordance with the procedures and policies created and mandated by defendant Dignity.

38. Dr. Natarajan raised objections to the due process violations described in this complaint. Corporations are persons within the meaning of section 1983. Defendant Dignity Health were persons acting under color of law in violation of section 1983 and the Fourteenth Amendment when it deprived Dr. Natarajan of his right to practice medicine without affording him due process and "fair hearings" and claimed that its conduct was authorized by section 809, et seq.

39. Dr. Natarajan has exhausted all state remedies available to him. On May 18, 2016, Dr. Natarajan filed a Petition for Administrative Mandamus in the Superior Court of San Joaquin County pursuant to Code of Civil Procedure § 1094.5, alleging that he had not received a fair administrative hearing from Respondent Dignity Health before it terminated his hospital privileges. The Court denied the Petition on the grounds that the hearing officer's opportunity to obtain future work at Dignity hospitals other than St. Joseph's was not a "direct financial benefit" under Section 809.2, subd. (b) and that St. Joseph's had used objective standards in the hearing. The Judgment denying the Petition was filed on September 27, 2017. Dr. Natarajan appealed. On October 22, 2019, the Court of Appeal issued an unpublished opinion denying Dr. Natarajan's Petition. The Court of Appeal issued a published opinion on November 20, 2019, following requests to publish by Dignity, the CHA, two

hospital systems and two hearing officers. The California Supreme Court granted review of Dr. Natarajan's Petition was granted on February 26, 2020. On May 8, 2020, Dr. Natarajan filed an Opening Brief and Dignity filed its response on August 10, 2020. Oral arguments were held May 18, 2021.

40. The issue presented before the California Supreme Court was "Does a physician with privileges at a private hospital have the right to disqualify a hearing officer in a proceedings for revocation of those privileges based on an appearance of or must the physician show actual bias?" The California Supreme Court affirmed the Court of Appeal's judgment on August 12, 2021. A Petition for Rehearing was filed on August 27, 2021 and subsequently denied. A final decision was rendered on October 13, 2021.

41. However, neither the trial court nor California Supreme Court have addressed this particular issue alleged in this complaint, i.e. whether a vested a property right of a Hospitalist, whose entire ability to practice medicine relies on hospital privileges, can be terminated without proper due process under the Fourteenth Amendment of the United States Constitution.

**VII. DR. NATARAJAN HAS BEEN DENIED DUE PROCESS.**

**Dr. Natarajan's Problems Began Because He Complained about Hospital Practices And Failed to Seek Whistleblower Protection.**

42. In 2007, Dignity (then "Catholic Healthcare West") hired Dr. Natarajan to be Director of its hospitalist group at St. Joseph's. While Dr. Natarajan was the Director of Dignity's hospitalist group at St. Joseph's, there were no criticisms of the quality of his medical documentation or his medical care. In fact, he was praised for his excellent medical record-keeping practices. He scored extremely high on St. Joseph's objective measures of clinical competence. Peer evaluations of his competence were also consistently excellent. Dr. Natarajan received several awards for providing compassionate care from St. Josephs.

43. However, in 2008, Dignity failed to renew Dr. Natarajan's contract as Director of its hospitalist group. This happened after Dr. Natarajan complained about inappropriate hospital practices. Dr. Natarajan was instructed by hospital administration to discharge patients before he felt they were ready to be discharged. Hospital administration also instructed the order in which patients should be seen, i.e. least sick to sickest. Dr. Natarajan protested the hospital's demands stating it was not in the best interest of the patients. He insisted on seeing patients that needed more urgent care first, such as those in the ICU. Dr. Natarajan complained to hospital administration that he felt there was a "corporate practice of medicine" going on.  As a result, Defendant retaliated against Dr. Natarajan because of those complaints and refused to renew his contract, despite his rave reviews. Dr. Natarajan should have, but failed to seek protection under whistleblower statutes.

**Dr. Natarajan Became a Direct Economic Competitor to Dignity and Dignity Initiated the Termination of His Privileges to Eliminate Their Economic Competitor.**

44. After Dignity refused to renew Dr. Natarajan's contract, he started his own hospitalist group, Central Valley Hospitalists (CVH) at St. Joseph's and as a result became a direct economic competitor of Dignity. CVH thrived, because many of Stockton's primary care physicians decided to use it for hospitalist services.  Dignity tried to buy out Dr. Natarajan's group but he refused. By 2013, St. Joseph's own hospitalist group had lost approximately $600,000 each year in the five years after Dr. Natarajan's departure, because of its low patient census.

45. Dignity then acted to eliminate its competitor. In 2013, St. Joseph's vice-president, Dr. Susan McDonald, initiated an investigation of Dr. Natarajan. Although the investigation was supposed to be a medical staff investigation, hospital administrators and the hospital's attorney, Harry Shulman, attended the investigating committee's meetings. Dr. Scott Neeley, a Dignity Vice-President, who was not a member of the medical staff, also attended and strongly advocated terminating Dr. Natarajan's privileges at those meetings. In violation of the hospital's bylaws, the hospital's Medical Executive Committee (MEC) never conducted its own investigation, despite Dr. Natarajan's request for an MEC

investigation, before it issued a recommendation to terminate his privileges. Dignity terminated Dr. Natarajan's privileges and also eliminated its economic competitor.

**Dignity's Claim That the Peer Review was Initiated Against Dr. Natarajan was Due to Issues with Record Keeping that was Detrimental to Patient Care is Untrue.**

46. Dignity claims that the peer review was initiated against Dr. Natarajan because he did not maintain his record-keeping and as a result was a detriment to patient care. However, during the entirety of Dr. Natarajan's time at St. Josephs and his entire career as a physician, he has never once been sued for malpractice or harming a patient. There is no evidence to support that any of the patients of the records that were used to support the charges against Dr. Natarajan were harmed in anyway. There has been no evidence to support that colleagues and other medical staff were affected by these "sub-par" records.   In fact, prior to initiating the peer review, Dignity without notice, retroactively scoured thousands of Dr. Natarajan's records. Dignity hand-picked specific records and then fabricated charges against Dr. Natarajan to eliminate Dr. Natarajan as an economic competitor.

47. Moreover, Dr. Natarajan was not placed on any immediate suspension to prevent patient harm. In fact, he was allowed to practice until the day his privileges were officially terminated, some two years later. At the time of the recommendation for termination of Dr. Natarajan's privileges he was performing perfectly well with his record-keeping, far better than many of his colleagues on the medical staff.

**Dr. Natarajan's Previous Record Keeping Issue Was Unrelated to the Peer Review and Was Created by Dignity In Part.**

48. Prior to charges being initiated, Dr. Natarajan had some tardiness in his record keeping. Other physicians at St. Josephs at the same time Dr. Natarajan worked there also had tardy record-keeping. Dr. Natarajan's tardiness occurred sometime around 2010 through 2012. Towards the end of this period, Dr. Natarajan's Hospitalist group was grossing nearly 1 million dollars annually, revenue that Dignity directly lost to CVH. In order to meet the growing demands of his group, he attempted to

hire more physicians. Dignity attempted to damage Dr. Natarajan's hospitalist group. Dr. Natarajan has previously described how Donald Wiley, the President of St. Joseph's, had attempted to weaken his group by trying to persuade local primary care physicians not to use it and by trying to hire away physicians from his group. Dr. Natarajan stepped in for the lost physicians and consequently, some records were completed late. Dignity had a role in creating this situation for Dr. Natarajan. Nonetheless, Dr. Natarajan remedied the late record keeping by 2013 and it was not an issue again.

**Dignity Also Refused to Appoint a Neutral Hearing Officer So That it Could Control the Outcome of the Peer Review.**

49. Once the peer review was initiated, Dignity, refused to appoint a neutral hearing officer so that it could control the outcome of the peer review. Dr. Natarajan requested a hearing on March 31, 2014. He asked for the hearing officer and physician hearing panel to be appointed by mutual agreement or to be neutrally selected. Dr. Natarajan offered to accept as a hearing officer any of 13 retired judges and a retired Court of Appeal justice. He further offered to consider any other retired judge or any other attorney qualified to serve as the hearing officer. He stated that if the parties were unable to agree on a hearing officer, he was willing to have the hearing officer selected by a superior court judge or other agreed-upon neutral party.

50. Under the circumstances, if there was any chance Dr. Natarajan was to have a fair peer review, he needed to have a neutral hearing officer. He described how hospitals usually appoint hearing officers who are hospital attorneys that have an economic incentive to please the hospitals to get future work. He pointed out that the hospital had financial conflicts of interest that disqualified it from appointing the hearing officer.

51. Dignity ignored Dr. Natarajan's request for a neutral hearing officer and instead selected A. Robert Singer, a friend of Harry Shulman, the hospital attorney. Singer was initially sought out by Todd Hecox, a Dignity attorney, and confirmed by the hospital's CMO, Dr. Neeley, the hospital vice-president who had previously advocated Dr. Natarajan's termination. This occurred on April 1, 2014,

just one day after Dr. Natarajan's hearing request. An initial phone call to appoint Mr. Singer as the hearing officer took place before Dr. Natarajan had even requested a hearing. On April 2, 2014, the hospital sent Dr. Natarajan a letter stating that the hospital's President had selected Singer.

**The Hearing Officer Influenced the Outcome of the Hearing.**

52. Mr. Singer, the hearing officer influenced the outcome of the hearing. An example of the hearing officer's influence on the hearing was his ruling denying Dr. Natarajan's objection to Dr. Richard Goldman's service on the hearing panel. Dr. Goldman, like all of the panel members, was unilaterally appointed by St. Joseph's. He received direct compensation from the hospital for serving as a medical director amounting to 5% of his income per year and received an additional substantial financial subsidy of over $100,000 per year for staffing and office rent. His practice was entirely dependent on the hospital's good will. Dr. Goldman was friends with Judith Rego, a hospital manager who testified against Dr. Natarajan. Singer nonetheless overruled Dr. Natarajan's objection to Dr. Goldman.

53. The hearing officer also made numerous rulings limiting Dr. Natarajan's evidence. He denied Dr. Natarajan's request to have a fellow hospitalist testify to show evidence of how a hospitalist operates. He also refused to give the hearing panel written jury instructions, even though the MEC, Dr. Natarajan and the hearing officer had agreed upon the content of the instructions, and Dr. Natarajan and the MEC agreed that the written instructions should be given. The hearing officer did not give the panel any oral instructions on the law before they deliberated. Because his deliberations with the hearing panel were not recorded, there is no record of his oral instructions to the panel. The hearing officer wrote the decision terminating Dr. Natarajan's privileges. The decision was his accumulation of negative facts he had compiled and his pejorative comments about Dr. Natarajan. Only one member of the hearing panel signed the decision, so it is unknown if four of the five hearing panel members

agreed to the decision. Mr. Singer was appointed by Dignity to ensure that it would win the peer review and more importantly, Dr. Natarajan's privileges would be terminated.

**Dr. Natarajan Was a Leading Hospitalist in Northern California But Has Lost His Career Due to This "Sham" Peer Review.**

54. After completing a dual residency program in internal medicine and pediatrics in Ohio in 2002, Dr. Natarajan began working as a hospitalist, then a new field of medicine. In 2004, he started practicing in Modesto for the Sutter Gould Medical Group. Based on his success with Gould, Stockton's Dameron Hospital hired him as the Hospitalist Director for its new hospitalist program. While at Dameron, Dr. Natarajan was elected President of the Society of Hospitalist Medicine – Northern California Chapter and helped develop some of the first standards and guidelines for hospitalists. In 2007, Dignity (then "Catholic Healthcare West") hired Dr. Natarajan to be Director of its hospitalist group at St. Joseph's.

55. Dr. Natarajan is a highly competent physician.  At the time of his hearing, he had treated approximately 10,000 different hospitalized patients. He has never been sued for malpractice. Before St. Joseph's 2013 charges, no one had raised any issues about Dr. Natarajan's competence.

56. It is cruel to physicians like Dr. Natarajan, who worked more than a decade to become a physician, who has never harmed a single patient through negligent medical care, and who was not found to have breached the standard of care in a single case, but rather lost his privileges due to trumped up of charges of delinquent medical records that would not have resulted in even a $250 fine if the hospital's rules governing medical records had been followed.  It is also cruel to the unknown individuals, especially in light of the ongoing Covid-19 Pandemic, who will suffer and die because of lack of access to competent physicians who have unfairly lost their privileges because they are someone's competitor or too outspoken for a hospital to tolerate.

**VIII.    Physicians Have a Fundamental Vested Property Interest In Their Hospital Privileges That Cannot Be Taken Without Due Process.**

57. In California, physicians have a fundamental vested property interest in their hospital privileges. Physicians' right to a fair hearing before losing their hospital privileges evolved from the fundamental common law right of individuals to work for a living. (*Pinsker II, supra,* 12 Cal.3d at 550-552.) Private organizations that affect the public interest have long been required to follow common law fair hearing procedures before excluding or expelling individuals whose livelihood depends on membership in those organizations. (*Ibid.*) Such hearings must be both procedurally and substantively fair. (*Id.* at 553.)

58. *Wyatt v. Tahoe Forest Hospital Dist.,* (1959) 174 Cal.App.2d 709, was the first case to hold that physicians could not be denied hospital privileges without a fair hearing. *Wyatt* recognized that physicians ordinarily cannot fully practice their profession without access to a hospital. (*Id.* at 715.) It held that Dr. Wyatt's past problems with the State's medical board did not warrant denial of hospital privileges without a hearing on the question of whether he was currently qualified to have privileges. (*Id.* at 714-715.) *Wyatt* involved a public hospital. Physicians' right to fair hearings was explicitly extended to private hospitals in *Ascherman v. San Francisco Medical Society* (1974) 39 Cal.App.3d 623, 631. *Ascherman* held that private non-profit hospitals are "quasi-public" entities, and that their control over hospital privileges was a fiduciary power to be exercised reasonably and for the public good. (*Id.* at 631, 644.) It further held that such hospitals could not deny physicians hospital privileges without minimal due process. (*Id.* at 631.)

59. In *Anton v. San Antonio Hospital District, supra,* this Court followed *Pinsker II* and endorsed the *Ascherman* decision when it mandated fair hearings with due process for physicians in both private and public hospitals. (*Id..* at 815.) *Anton* also strengthened the requirement for fair hearings by basing its decision on the recognition that physicians have a fundamental vested property interest in their hospital privileges that cannot be taken without due process. (*Id.,* at 823-825.) That holding was based on long-standing California case law recognizing that physicians have a

Complaint for Declaratory and Injunctive Relief - 20

fundamental property interest in their right to practice medicine, and the importance of doctors' careers to their lives:

> We think it manifest . . . that the decision before us has a substantial effect on a right which is "fundamental." "In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation." (*Bixby v. Pierno, supra*, 4 Cal.3d 130, 144.) As the court said in *Edwards v. Fresno Community Hosp.* (1974) 38 Cal.App.3d 702, 705 . . . "Although the term `hospital privileges' connotes personal activity and personal rights may be incidentally involved in the exercise of these privileges, the essential nature of a qualified physician's right to use the facilities of a hospital is a property interest which directly relates to the pursuit of his livelihood."

(*Anton,* at 823; see also, *Hewitt v. Board of Medical Examiners* (1906) 148 Cal. 590, 592.)

60. *Anton* reflects the reality that physicians ordinarily must spend at least eleven years working extremely hard in college, medical school and residency to attain their professions; that using those knowledge and skills to heal the sick has rewards that are not merely financial; and that both physicians and hospitals have an extremely important public purpose in protecting the public health. When a physician's career hangs in the balance, far more is at stake than just who will get how much money, the issue in most civil litigation and arbitrations. Dr. Natarajan spent nearly 13 years in universities and residencies before becoming a hospitalist. (8 PAR 1745.) As a hospitalist, he cannot, of course, practice his speciality without access to a hospital. (16 PAR 3741-3742.) Without hospital privileges, he is denied access to those he trained to serve, protect and heal.

61. In *Mileikowsky v. West Hills Hospital* (2009) 45 Cal.4th 1259, this Court again recognized the importance of fair hearings to physicians and reaffirmed that they have a property interest in their hospital privileges directly connected to their livelihoods. The Court also recognized that an adverse hearing decision can have an immediate and devastating impact on a physician's career because of state and national reporting requirements: "A hospital's decision to deny staff privileges therefore may have the effect of ending the physician's career." (*Id.* at 1267-1268.) The Legislature has recognized

that unfair peer review not only impacts physicians, but also has a negative impact on the public health by removing qualified physicians from the workforce.  (Business and Professions Code § 809, subd. (a)(4).)

### Hospitalists Are Unlike Other Physicians and Should be Afforded Due Process.

62. Dr. Natarajan, a hospitalist is a relatively new breed of physicians. Hospitalists, like Emergency Room Physicians, operate to deliver acute and critical care only within a hospital setting. Hospitalists completely rely on hospital privileges and access to the hospital to practice medicine. Dr. Natarajan has been a hospitalist ever since he graduated from residency in 2002. In fact, he has only been a hospitalist until his privileges were terminated in 2015. Once a hospital terminates a hospitalist's privileges and a "805" report is made, the consequences are tantamount to a hospitalist losing his or her career.  In other words, their vested right to practice medicine is at stake and demands proper due process.

63. Given the extremely high stakes for physicians, and the public interest in truly fair peer review hearings, doctors practicing in private hospitals are entitled to the same protection from adjudicators with an appearance of bias as doctors in public hospitals, or other litigants in quasi-judicial or judicial hearings.

## IX.    THE DUE PROCESS VIOLATIONS CAN BE CORRECTED WITH NO COST, REDUCED COST, OR MINIMAL ADDITIONAL COSTS.

64. Each of the due process violations described above can be corrected at no cost or minimal additional cost to the defendants and other healthcare corporations which are required to hold medical disciplinary hearings. In many cases, compliance with federal due process requirements may actually reduce the costs to private healthcare corporations. The current costs of holding a medical staff hearing can be substantial. In most or all medical staff hearings, the fees to the hearing officer are a substantial cost.

65. Any additional cost of having mutually-agreed-upon or neutrally-selected hearing officer and hearing panel members would be minimal or non-existent. There might be a small amount of additional attorney's fees for the healthcare corporation for communications about who should serve as neutrals in the medical disciplinary hearing. Any such additional attorney's fees would likely be matched or exceeded by eliminating pre-hearing motions seeking to disqualify or recuse a unilaterally selected hearing officer and hearing panel. Mutually-agreed-upon hearing officers and panel members would either eliminate or minimize the need for voir dire of those individuals. In some cases, the parties might need to go to a court for assistance in choosing a neutral hearing officer and/or panel members. The cost of a single state court motion seeking the appointment of neutrals would not be a significant additional cost in proportion to the substantial costs ordinarily incurred in connection with medical disciplinary hearings. Additional savings would be incurred in post-hearing litigation. In cases in which a hearing panel determines that discipline is reasonable and warranted, physicians will be less likely to seek to overturn the hearing decision through a petition for writ of mandate on the ground that the hearing was unfair.

66. Requiring that the defendants use an objective neutral standard would not increase the cost of medical disciplinary hearings in any respect. Expert witnesses are currently always or virtually always used in medical disciplinary hearings concerning clinical issues. There would be no additional cost if healthcare corporations were required to use objective neutral standards. The use of objective neutral standards such as the standard of care would reduce costs in many cases. It would likely reduce the number of medical disciplinary hearings, since charges on clinical grounds would not be brought if the hospital was unable to obtain an expert witness supporting a violation of the objective neutral standard. In addition, the use of an objective neutral standard would also make it easier and less time consuming, and therefore less costly, for a governing body or court reviewing a hearing panel's decision to determine whether substantial evidence supported the decision.

67. Requiring timely judicial review of medical disciplinary hearings would substantially reduce the overall cost of such hearings to healthcare corporations. The current California prohibition on a physician challenging even the most extreme procedural irregularities can result in a healthcare corporation spending more than a million dollars prosecuting a hearing that which is facially invalid.

68. California's prohibition on challenging a unilaterally selected hearing officer until after a hearing is concluded is a particular egregious example of how resources can be wasted on an obviously defective hearing. Under current California law, until the hearing is completed, the only person who is authorized to decide on whether a hearing officer is biased is the hearing officer. As described above, if the hearing officer rejects the challenge, he or she can gain in excess of $100,000, so there is a powerful financial stake and incentive for the hearing officer to require a full hearing. This is so even if he or she knows that the hearing is likely to be reversed following a petition for a writ of mandate, and even if the defective hearing will cost the healthcare corporation hundreds of thousands of dollars or more. Furthermore, requiring timely judicial review will prevent hearings with significant procedural problems from continuing unless and until the procedural problems are corrected. This will prevent or limit the necessity for subsequent judicial review by way of a petition for writ of mandate, again saving costs for the healthcare corporation and conserving judicial resources.

## X.    THE FOLLOWING REMEDIES AND RELIEF ARE SOUGHT BY DR. NATARAJAN.

**69.** Dr. Natarajan seeks a declaration from this Court pursuant to 42 U.S.C. section 1983 that California law governing medical disciplinary hearings of physicians and other California licentiates pursuant to California Business and Professions Code section 809 et seq. violates Federal due process guaranteed by the Fourteenth Amendment of the United States Constitution.

70. Dr. Natarajan seeks an injunction requiring the reinstatement of his privileges to practice at St. Josephs which were terminated on November 2015.

71. Dr. Natarajan seeks attorneys fees and expenses incurred in bringing this lawsuit pursuant to 42 U.S.C. section 1988, subd. (b).

72 Dr. Natarajan also seeks such other relief as this Court may deem just and proper.

Dated: November 12, 2021

Tara Natarajan
Attorney For Plaintiff
Dr. Sundar Natarajan

Complaint for Declaratory and Injunctive Relief - 25